HARMEET K. DHILLON (SBN: 207873)
harmeet@dhillonlaw.com
DOROTHY C. YAMAMOTO (SBN: 306817)
dorothy@dhillonlaw.com
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, California 94108
Telephone: (415) 433-1700
Facsimile: (415) 520-6593

Attorneys for Plaintiff Haley Friary

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

HALEY FRIARY, an individual,

Plaintiff,

vs.

GLASSPOINT SOLAR, INC., a Delaware corporation, and DOES 1-10,

Defendants.

**Case Number:**

**COMPLAINT FOR DAMAGES FOR:**

(1) Violation of the Equal Pay Act (29 U.S.C. § 206(d); 29 C.F.R. § 1620.1)
(2) Violation of California's Equal Pay Act (Cal. Lab. Code § 1197.5)
(3) Retaliation in Violation of Cal. Lab. Code § 1102.5
(4) Intentional Infliction of Emotional Distress
(5) Unfair Business Practices in Violation of Cal. Bus. & Prof. Code §§ 17200 *et seq.*

**JURY TRIAL DEMANDED**

Plaintiff Haley Friary ("Ms. Friary" or "Plaintiff"), through her attorneys, Dhillon Law Group, Inc., files this Complaint against GlassPoint Solar, Inc., a Delaware corporation, conducting business as a foreign corporation in California ("GlassPoint Solar" or "the Company" or "Defendant") and DOES 1-10 (collectively, "Defendants"), and alleges as follows:

**INTRODUCTION**

1. This action arises from GlassPoint Solar's unlawful practices of paying females in the Company less than males in the Company for equal and/or substantially similar work, and of harassing and retaliating against Plaintiff Haley Friary after she repeatedly advised the Company against multiple illegal practices associated with the Company's downsizing actions.

2. Ms. Friary brings this action for compensatory damages, injunctive relief, statutory and civil penalties, emotional damages, liquidated damages, punitive damages, costs and expenses, and attorneys' fees under the federal Equal Pay Act, California Labor Code, California common law, and the California Unfair Competition Law. Plaintiff seeks redress for her injuries sustained from Defendant's violations in a timely manner as to each cause of action.

**PARTIES**

3. Plaintiff Haley Friary is an individual who, at all times relevant to this action, was an employee of Defendant, GlassPoint Solar. While employed by GlassPoint Solar, Ms. Friary resided in Sonoma County, California until 2017, and afterwards resided in Marin County, California.

4. Defendant GlassPoint Solar is and was at all times relevant to this action a Delaware corporation doing business as a foreign corporation in California, which according to its filings with the California Secretary of State, has its principal executive office at One Market Street, Spear Tower, 36th Floor in San Francisco, CA 94105 and principal place of business in Fremont, CA. GlassPoint Solar is and was at all relevant times an employer as defined by the California Labor Code § 350(a) and California Government Code § 12926(d).

5. Plaintiff Ms. Friary is ignorant of the true names and capacities of the Defendants sued herein as DOES 1 through 10. Defendants DOES 1 through 10 are sued herein under fictitious names. Friary is informed and believes, and on that basis alleges, that Defendant may be reorganizing its business in the near future, and that each Defendant sued under such fictitious names is in some

manner responsible for the wrongs and damages as alleged herein. Friary does not at the time know the true names or capacities of said Defendants, but prays for leave to amend and serve such fictitiously named Defendants once their names and capacities become known.

**JURISDICTION AND VENUE**

6. This action arises under 29 U.S.C. § 206(d) in relation to equal pay violations against the Plaintiff. Accordingly, this Court has federal question jurisdiction under 28 U.S.C. §§ 1331 and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the related state claims.

7. Venue is proper in this judicial district under 28 U.S.C. § 1391, because based on information and belief, Defendant resides in this District for purposes of venue. Venue is also proper because a substantial part of the acts or omissions giving rise to the claims for relief occurred in or were directed to this District and each of the Defendants are subject to the personal jurisdiction of this Court.

8. This Court has personal jurisdiction over the Defendants, because each Defendant is domiciled in the State of California, has sufficient minimum contacts with California, and otherwise has intentionally availed himself, herself, or itself of significant benefits provided by the State of California, rendering the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

9. Ms. Friary timely filed a complaint with the DFEH and EEOC regarding the claims listed herein, and has therefore timely exhausted her administrative remedies.

**INTRADISTRICT ASSIGNMENT**

10. This case should be assigned to San Francisco or Oakland pursuant to Civil Local Rule 3-2(c), because substantially all of the events or omissions which give rise to the claims occurred in the County of Alameda.

**GENERAL ALLEGATIONS**

**GlassPoint Solar Hires Plaintiff at Below Market Rate**

11. Ms. Friary is a seasoned human resources leader, with more than fifteen years of experience supporting start-ups as well as large corporations in developing and maintaining robust and effective human resources management systems.

12. Prior to starting at GlassPoint Solar, Ms. Friary's annual income was approximately $250,000 plus bonus and stock options.

13. On or around August 26, 2016, Ms. Friary began her employment with GlassPoint Solar as the VP Global Human Resources Executive, earning approximately $230,000.00 per year with 46,000 stock options, 401K matching program worth approximately $8,750.00 per year, and health benefits.

14. The same week Ms. Friary began her employment, GlassPoint Solar's then CFO, Dave Allsworth ("Mr. Allsworth"), informed Ms. Friary that the company would compensate her for weekend/holiday work and that she should track the hours she worked on those days. Mr. Allsworth showed the log that he used to track his own hours, and he told Ms. Friary to do the same.

15. Ms. Friary's job duties as the VP Global Human Resources involved building a global human resources function by merging three global locations, supporting the CFO in delivering HR reports for the Board of Directors, and traveling approximately 25% of the year to monitor other branches of the company.

16. Ms. Friary successfully performed her job duties, and the Company did not give her any verbal or written complaints about her work during this time.

17. As of November 2016—only three months after Ms. Friary began her employment at the Company—the Company dramatically increased Ms. Friary's workload and job responsibilities due to changes in executive leadership in which the founding CEO was forcibly removed from his position due to a complaint by CFO Mr. Allsworth and COO Ben Bierman ("Mr. Bierman").

18. At this time, the Company escalated Ms. Friary's job responsibilities to help stabilize the company executives and employees. Ms. Friary and Messrs. Allsworth and Bierman largely managed all non-engineering activities of the Company until Steve Moss ("Mr. Moss") was hired in 2018. Ms. Friary's team grew to support what was a rapid global expansion of the Company. Ms. Friary's responsibilities at the Company expanded so dramatically that her required travel from the expected 25% of the year to 70% annually.

19. As of February 2017, Ms. Friary's role at the Company had elevated to the point where she was treated as an executive staff employee and directed to report to the acting Chief Executive



Officer ("CEO") and Chair of Board ("COB") of the Company.

**Ms. Friary Informs GlassPoint Solar of Gender Discrepancy in Pay**

20. That same month, the Company asked Ms. Friary to research how the Company's salaries compared with the market rate. Ms. Friary compiled this data, included her own salary in the data, and summarized her salary findings in a Powerpoint slide.

21. Ms. Friary sent the slide to the Chairman of the Board of Directors. The slide reflected that the male executives at the Company were being paid 99% - 138% market rate as a base salary. By contrast, the female executive in the Company was paid 86% market rate.

22. Despite clear evidence of gender pay disparity, the Company did nothing to address the situation. Ms. Friary repeatedly had conversations regarding her pay inequity with Messrs. Allsworth and Bierman during that period.

23. Around November 2017, the Company decided to implement a new bonus structure. The bonus structure assigned three benchmarks for employees to accomplish throughout the year. When each benchmark was reached, the employee would receive 50%--100%--150% of their "salary percentage" (i.e. a set percentage of their salary) at the end of the year depending on how many benchmarks the employee reached. The Company stated that Ms. Friary's bonus salary percentage would be 17.5% of her salary in 2018 partly due to the retention bonus that the Company anticipated paying executive staff employees and those in sales positions in early 2018 due to the CEO change. However, as an executive staff employee, Ms. Friary was eligible for a 35% bonus in 2019, the same salary percentages as all other executive staff members at the Company.

24. That same month, Ms. Friary compiled data and developed another Powerpoint slide reflecting bonus eligibility based on the new bonus structure that the Company had implemented. The slide reflected all levels of leadership—not solely executive employees—at the Company.

25. The slide included information such as the employee's name, title, salary, the proposed bonus percentage, and the expected bonus based on which benchmark was made. Overall, the slide demonstrated that male leadership at the company was being paid above market rate (avg. 112% to market rate) whereas female leadership at the Company were paid lower percentages to market rate (avg. 95% to market rate).

26. Once again, Ms. Friary forwarded this slide to the Board of Directors and CEO, and the Company failed to respond.

27. In February 2018, the Company's then CEO Mr. Bierman acknowledged that Ms. Friary was not being adequately compensated at the Company. Mr. Beirman informed Ms. Friary that he had recommended to the Company's incoming new CEO—Mr. Moss—that Ms. Friary should be given a raise and promotion comparable to her position in the company. Mr. Bierman also told Ms. Friary that he recognized Ms. Friary had been acting in the capacity of a Chief Human Resources Officer, an executive staff position, since November 2016.

28. Before Mr. Moss joined the Company, the Company paid all executive staff members the retention bonus for the period of time until the new CEO started at the Company. Ms. Friary was paid a lower bonus than the male executive staff members.

**GlassPoint Solar Refuses to Adjust Ms. Friary's Salary**

29. Later in February 2018, Mr. Moss became the Company's new CEO, but Mr. Moss did not initiate any conversation about promoting Ms. Friary or adequately compensating her. Instead, Ms. Friary had to initiate the topic on several occasions, to which Mr. Moss responded that he would rectify the situation "when the time was right."

30. But the time was apparently never right. Instead, over the next six months or so, Mr. Moss devoted his efforts to increase Ms. Friary's already existing job duties. For instance, in April 2018, Ms. Friary underwent a major surgery that required home rest. However, Mr. Moss made it clear that he expected Ms. Friary to dial in and participate in an eight-hour long leadership call via video during her recovery. He also pressured Ms. Friary to postpone her honeymoon three times to accommodate his last-minute business requests. Mr. Moss even called Ms. Friary during her honeymoon for a two-hour emergency call since an executive employee in the company had "just resigned" or words to similar effect.

31. Throughout these six or so months, Ms. Friary continued to ask Mr. Moss about her salary and title situation. Mr. Moss told Ms. Friary on three separate occasions that he would discuss her salary and promotion at the next Board of Director's meeting, but as of November 2018, Ms. Friary was still being compensated at a lower market rate than the other male executive staff, and

without any promotion. Moss made frequent and regular comments to Ms. Friary that the Executives at GlassPoint were like "pigs at a trough" with regards to their pay. Ms. Friary felt this was an attempt to intimidate her and discourage her from seeking an equitable salary.

32. Given the significant delays in rectifying her salary and job title issues, Ms. Friary felt compelled to explain to Ms. Nancy Floyd ("Ms. Floyd"), a Board of Director observer, the situation with her pay and promotion. Ms. Friary also informed Ms. Floyd that Ms. Friary was concerned the Company also faced possible exposure due to general unequal pay standards for women that Ms. Friary had been observing during her employment at the Company.

33. However, once again, the Company failed to address the issues that Ms. Friary had raised.

34. Around November 2018, the Company asked all executive staff members to sign a "Change in Control and Separation Agreement." The Company gave Ms. Friary this agreement to sign.

35. As of February 2019, the Company still had not adjusted Ms. Friary's compensation rate. At that point, with little other options, Ms. Friary felt compelled to resign from the company. Accordingly, on February 7, 2019, Ms. Friary wrote out a resignation letter to Mr. Moss. (See **Figure 1**).

**February 7, 2019**

**Steven J. Moss**
**Chief Executive Officer**
**GlassPoint Solar**
**<Delivered by Hand>**

Dear Steve,

Per our meeting today, I believe it's in everyone's best interest if I now tender my resignation. The issues surrounding pay inequity that I have brought to your attention first in August 2018, in November 2018 (attached slides), in January of 2019 and again today (attached slides) have not been able to be resolved. I continue to be paid at a Compa Ratio that is more



than 10% less than my executive counterparts and significantly less than other non- executive VP's who do not have the same level of responsibility as me.

I have consistently been asked to wait until the next board meeting, business milestone or for better timing for raising my pay to internal and market standards. You have confirmed as have BOD members, that I am considered a consistent top performer with considerable contributions to the company. You most recently suggested and supported a move into the business as VP of Global Supply Chain where I can continue to resolve complex business dilemmas. I see this as further evidence of your vote of confidence in my leadership and capability. However, my move to this role has been pushed out from the original move date of first of March 2019.

I am saddened and disappointed that what I believed to be an exciting, rewarding opportunity which provided growth and continued employment within a new function in GlassPoint has now been lost after only a few weeks. I have been truly excited about pursuing this new possibility especially after receiving votes of confidence from you, the COO, CFO and a BOD observer. At this point in time I feel this opportunity has been another "future promise" to defer a decision on my pay.

I asked David Tickner, COO, who was to be my new manager to please confirm my compensation package before I confirmed my move from VP of Global Human Resources to VP of Global Supply Chain. He was supportive of my compensation request (attached) and was trying to receive a firm confirmation from you before Christmas 2018. To date there has been no response to this request and this is why I was compelled to, once again, ask you for my increase in the February BOD.

Additionally, we had a call earlier this week about bonuses post Aera for recognition of work achieved in various functions during 2018. My name was not mentioned in that call. I followed up our call with the list of people you mentioned you'd put on the bonus list. I asked for your confirmation that this was list of bonus recipients you intended and have not received a response. This action combined with all of the above inaction serves as further confirmation of intent to suppress my pay. (Attached e-mail)

After careful consideration of the time I have sacrificed with my husband and family, postponing our honeymoon 3 times due to pressing work travel, taking calls on my honeymoon, living away from my home when in CA and consistently being paid less than my peers, this has become an untenable position in which I cannot remain.

As the only female in an all-male executive staff and as the VP of Global Human Resources, it is a very uncomfortable position to have to advocate for my own pay equality and monies earned and owed to me.

Based on the mutual 6 months' notice period I signed with GlassPoint, below is what I propose:

My last day as a GlassPoint employee be accepted as March 8, 2019. My last physical day in the office will be February 28. From the period between now and March 8, I will continue to act in the capacity as VP Global Human Resources and provide the professional services needed by the company. For 2 months following the notice period, until May 8, 2019, I will work offsite as a GP Consultant to support my transition.

I will also assist in recruiting a suitable replacement and in bringing the existing, HRD US up to speed on my duties. I will be available during US regular working hours for e-mail, phone calls and video conferences to train and support the team. During the period following my resignation I will not be available for travel to the Middle East. I will be available to travel to China if required.

Based on the full and timely payment of compensation as outlined below, I will sign a separation agreement and release of claims including a mutual non-disparagement clause. I also request that in recognition of my demonstrated good work that I be paid monies I am owed and similarly treated as other departing executives.

- Payment of all accrued and owed vacation benefits on March 8, 2018 = 264 hours = $32,117.88
- Stock options continue to vest while I am providing consulting services to the company until May 8, 2018.
- After service date termination, a recommendation will be made to the BOD that option vesting to be extended for 5 years.
    - Precedent has been previously set for the above request by Company and BOD by approving the same benefit for departing executive staff members: Dave Allsworth, Marwan Chaar and Ben Bierman
- Payment of the remaining 3 months of notice period on March 8, 2018 = $63,263.19
- Payment of 2018 bonus achieved of $48,965 on March 8, 2018

- Precedent of bonus payout on resignation and termination has already been made by payment of bonus to departing employees Marwan Chaar and Keith Fay – both VP level employees.
- The consulting period between March 8, 2019 and May 8, 2019 (Worked notice period) to be paid at a rate of $26,500 a month due and payable at the first of each month. First consulting period to be paid April 8, 2018 and second payment on May 8, 2018. To be documented in a GlassPoint consulting agreement. In the event the 2 months consulting period is not acceptable the additional 2 months will be due and payable at existing rate of pay on March 8, 2018.
    - This amount constitutes a monthly salary based on a base salary of $285,000 annually + $2683.24 per month for Cobra benefits.

I am disappointed to have no other options at GlassPoint after the level of contribution and sacrifice I have made. I believe I have exhausted all options available to me to resolve this issue on numerous occasions. I will continue to do my best to support GlassPoint and our employees until May 8, 2019.

Sincerely,

Haley Friary, SHRM SCP, SPHR, GPHR

**Figure 1**

36. This latest action by Ms. Friary finally prompted Mr. Moss to respond, and the Company finally increased Ms. Friary's pay to $282,000.00 and adjusted her title to Chief Human Resources Officer. Ms. Friary is informed and believes that this latest salary is comparable to the amount she should have been paid when Mr. Moss became CEO in February 2018.

37. This sought after adjustment was also dampened by the fact that the Company also informed Ms. Friary that the Company would not be paying out 2018 bonuses due to "financial issues" even though she had met with Mr. Moss on or around January 7, 2019, and the two of them agree that Ms. Friary had successfully met all three of her 2018 benchmarks. Based on the Company's bonus structure, Ms. Friary was entitled to a 2018 bonus of approximately $92,750.00.

38. A few months later, however, Ms. Friary prepared two severance packages for two male executive staff employees that included their 2018 bonuses. Neither of these male employees had earned their 2018 bonuses.

**GlassPoint Solar Retaliates Against Ms. Friary Due to Her Whistleblowing Activities.**

39. Shortly after Ms. Friary received her long-sought after salary and title adjustment, on or around June 4, 2019, GlassPoint Solar gave Ms. Friary notice that she would be terminated due to alleged downsizing activities. According to the notice, Ms. Friary's last day of employment would



occur in December 2019. (See **Figure 2**.)

40. The notice was allegedly part of a business reorganization plan that began to take place shortly after Mr. Moss became the CEO in February 2018.

DocuSign Envelope ID: A0B62052-5A63-43B7-A998-D9795BF40C2F

GlassPoint

ADDRESS
GlassPoint Solar, Inc.
47669 Fremont Blvd.
Fremont, CA 94538

MAIN
+1 (415) 778-2800

FAX
+1 (415) 762-1966

WEB
www.glasspoint.com

June 11, 2019

Haley Friary
Chief Human Resources Officer
Delivered via e-mail and DocuSign

Dear Haley

This letter memorializes our understanding that on June 6, 2019, GlassPoint activated your six-month notice period due to job elimination/layoff. Your last day will be December 6, 2019. The scope of your responsibility remains the same during this period and your compensation and benefits remain unchanged up through your last day of employment with GlassPoint on December 6, 2019.

Sincerely,

S. Moss

Steven J. Moss
CEO

CC: Dan Judge, Corporate Counsel

**Figure 2**

41. When the reorganization first began, Ms. Friary had worked closely with Mr. Moss in organizing and implementing the downsizing plan. Mr. Moss sent Ms. Friary lists of job positions and employees that needed to be eliminated. Ms. Friary reviewed the lists and advised Mr. Moss about his legal obligations to his employees and his fiduciary duties to the company, which Mr. Moss repeatedly responded negatively toward Ms. Friary on. Indeed, Ms. Friary is informed and believes that Mr. Moss purposefully delayed adjusting her salary and title due to her constant reminders to Mr. Moss about the Company's legal obligations to its employees.

42. His irritation with Ms. Friary only increased after her salary and title were adjusted in 2019. Around June 2019, Mr. Moss had placed the CFO on the "termination list" even though the CFO was on medical leave. Ms. Friary advised against terminating the CFO while he was on medical



leave, since that could expose the company to legal liability.

43. Mr. Moss argued at length with Ms. Friary, and ultimately a compromise was reached that the company would negotiate a severance package with the CFO. Mr. Moss, however, threatened Ms. Friary that "other notice employees [such as Ms. Friary] should not expect the same," and if the company went under, that Ms. Friary would have to "get in line with the rest of the debt collectors."

44. Around the same time, Ms. Friary also removed from the "termination list" another employee that had just reported health issues, and Mr. Moss yelled at Ms. Friary for that at 9:00 p.m. and repeatedly suggested to her that her job during her notice period was still "on the line" or words to similar effect.

45. Ms. Friary also learned that Mr. Moss was communicating closely with one of the company's shareholders, Shell Global, without involving Board members or other shareholders, and trying to convince Shell to acquire additional ownership in the company to become the majority shareholder. Mr. Moss even went so far as to tell the entire Executive Team at the February 2019 Leadership meeting that the Company's future is in aligning with Shell and SGRF and ignoring the VC's.

46. Ms. Friary had serious concerns that Mr. Moss was breaching his fiduciary duties to the Company, and she shared her concerns with the COO David Tickner, the CTO Pete von Behrens, and General Counsel, Dan Judge, as well as Richard McKellar of Chrysalix who is a board member. She also attempted to advise Mr. Moss about his fiduciary duties to the board, stating that his latest actions seemed to favor a group of shareholders over the others.

47. In response, Mr. Moss began to exclude Ms. Friary from projects and daily activities that require the involvement of Human Resources.

48. For instance, on June 24, 2019, Ms. Friary learned for the first time that Mr. Moss was recruiting a new CFO to work remotely in Switzerland without consulting her at all on the employment agreement, the terms of compensation, and the proper legal and business procedures in executing the arrangement. Instead, Mr. Moss asked someone from Ms. Friary's staff to draft an Omani legal contract to finalize the arrangement.

49. The staff member ultimately copied Ms. Friary on the draft sent to Mr. Moss, and she

immediately informed Mr. Moss that he was not completing the appropriate paperwork needed to hire someone from Switzerland, and that the Board of Directors would need to be involved before a new CFO could be hired.

50. Shortly afterwards, the Company requested that Ms. Friary voluntarily place herself on "garden leave" or paid administrative leave. Ms. Friary declined the request, since she was still eager to perform her job duties until the end of her notice period.

51. Nevertheless, on or around August 2019, the Company forced Ms. Friary on paid administrative leave indefinitely. Ms. Friary is informed and believes that all of the aforementioned acts are the Company's attempts to constructive discharge her due to her complaints about unequal pay and breached fiduciary duties.

52. As a result of being forced on administrative leave, Ms. Friary has suffered emotional distress, humiliation, and depression as a result.

53. To date, Ms. Friary has worked 27 days of weekend and holiday work, which equates to approximately $29,283.12. Ms. Friary is informed and believes that male executive staff such as former CEO Mr. Bierman and CFO Mr. Allsworth were paid for weekend and holiday work. However, Ms. Friary has not been compensated for this additional time worked.

54. To date, Ms. Friary has also accrued 280 hours of vacation time at GlassPoint Solar. Ms. Friary is informed and believes that all male executive staff were paid for their accrued vacation time. However, to date, Ms. Friary has not been paid any of her accrued vacation time.

**FIRST CAUSE OF ACTION**

**Violation of 29 U.S.C. § 206(d); 29 C.F.R. § 1620.1**

**(By Plaintiff Against All Defendants)**

55. Ms. Friary incorporates every allegation in the preceding paragraphs, as though set forth fully herein.

56. The federal Equal Pay Act prohibits employers from paying different wages to employees of opposite sex when the work requires equal skill, effort, and responsibility in its performance and which is performed under substantially similar working conditions. 29 U.S.C. § 206(d). Whether a job is substantially equal is determined on a case-by-case basis and resolved by an

overall comparison of the positions and work, not its individual segments. *See Stanley v. Univ. of S. California*, 178 F.3d 1069, 1074 (9th Cir. 1999).

57. Here, GlassPoint Solar executive staff have substantially similar responsibilities, and require substantially similar skills and effort in their role. For example, executive staff are responsible for managing several employees; report directly to the CEO and COB of the Company; are subject to the same identical bonus salary percentage structure; and were asked to sign the same Change in Control and Separation Agreement.

58. Nevertheless, GlassPoint Solar consistently paid Ms. Friary, an executive staff member, a lower percentage market rate than other male executive staff.

59. As a direct, proximate and legal result of Defendant's conduct, as described herein, Plaintiff has suffered economic damages in an amount to be proven at trial, but in excess of $500,000.00 for loss past wages and bonuses.

60. Ms. Friary also seeks recovery for penalties incurred, attorney fees, and costs and expenses incurred in pursuing this litigation.

**SECOND CAUSE OF ACTION**

**Violation of Labor Code § 1197.5**

**(By Plaintiff Against All Defendants)**

61. Ms. Friary incorporates every allegation in the preceding paragraphs, as though set forth fully herein.

62. Labor Code § 1197.5 prohibits an employer from paying an employee of a different gender higher pay "for substantially similar work." The statute also prohibits employers from discriminating or retaliating against any employee for invoking the employee's rights under the statute or assisting others to invoke their rights thereunder.

63. Here, GlassPoint Solar executive staff are engaged in substantially similar work.

64. Nevertheless, GlassPoint Solar consistently paid female executive staff, including, but not limited to, Ms. Friary, a lower percentage market rate than other male executive staff.

65. GlassPoint Solar was aware that there was a gender pay discrepancy in the Company and failed to address or remedy the situation.



66. As a direct, proximate and legal result of Defendant's conduct, as described herein, Plaintiff has suffered economic damages in an amount to be proven at trial for loss past wages and bonuses.

67. As a further direct and proximate result of Defendant's willful and intentional malicious conduct, as described herein, Ms. Friary has suffered detriment to her person within the meaning of California Civil Code § 3294, thus entitling her to recover punitive damages at an amount to be proven at trial.

68. Ms. Friary also seeks recovery for statutory penalties, attorney fees, and costs and expenses incurred in pursuing this litigation.

**THIRD CAUSE OF ACTION**

**Retaliation in Violation of Cal. Lab. Code § 1102.5**

**(By Plaintiff Against All Defendants)**

69. Ms. Friary incorporates every allegation in the preceding paragraphs, as though set forth fully herein.

70. California Labor Code § 1102.5 provides in relevant part that:

> (b) An employer, or any person acting on behalf of the employer, shall not retaliate against an employee for disclosing information . . . to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance . . . if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties.

71. At all times relevant hereto, Ms. Friary was acting in good faith and had reasonable cause to believe the discrepancy in pay among executive staff and leadership violated both federal and state equal pay laws, as described herein.

72. Ms. Friary provided proof of the disparity to the Company's CEO and Board of Directors, yet the Company repeatedly failed to remedy the situation.

73. Ms. Friary also informed Company leadership about what she reasonably believed to be Mr. Moss' violations of his fiduciary duties to the Company and its shareholders.

74. Upon Ms. Friary's reporting, and as a direct reprisal and in retaliation for Plaintiff's conduct in reporting the pay disparity and breach of fiduciary duty, Mr. Moss refused to adjust Ms. Friary's salary and job title, provided Ms. Friary with a notice of termination, and ultimately placed her on administrative leave.

75. As a direct, proximate and legal result of Defendant's conduct, as described herein, Plaintiff has suffered economic damages in an amount to be proven at trial, but in excess of $1,000,000.00 for, *inter alia*, lost wages, annual bonuses, health benefits, and retirement benefits.

76. As a further direct and proximate result of Defendant's willful and intentional malicious conduct, as described herein, Ms. Friary has suffered detriment to her person within the meaning of California Civil Code § 3294, thus entitling her to recover punitive damages at an amount to be proven at trial.

77. As a further direct and proximate result of Defendant's conduct in constructively discharging Ms. Friary in direct retaliation for her protected "whistleblowing" activities, Ms. Friary has suffered, and continues to suffer, humiliation, mental anguish, and extreme emotional and physical distress, and has been injured in mind and body according to proof, all to the Plaintiff's severe damage, thus entitling Ms. Friary to compensatory damages in an amount according to proof. *See Phillips v. Gemini Moving Specialists*, 63 Cal.App.4th 563, 577 (1998).

78. Ms. Friary also requests the Court impose maximum civil penalties of $10,000.00 for each violation of the statute.

**FOURTH CAUSE OF ACTION**

**Intentional Infliction of Emotional Distress**

**(By Plaintiff Against All Defendants)**

79. Ms. Friary incorporates every allegation in the preceding paragraphs, as though set forth fully herein.

80. Ms. Friary is informed, believes, and thereon alleges, that the aforementioned conduct of GlassPoint Solar and/or DOES 1-10 was extreme and outrageous. Specifically, Ms. Friary is informed, believes, and alleges Mr. Moss, functioning as the agent and employee of Company, acted in a manner wholly outside the bounds of conduct tolerated by decent society.



81. Ms. Friary is informed, believes, and alleges that Mr. Moss intended to cause her severe emotional distress for whistleblowing by permitting, encouraging, and/or personally conducting actions meant to intimidate and harass Plaintiff. Such actions include refusing to adjust Plaintiff's salary and title, verbally abusing Plaintiff, and ultimately placing Plaintiff on administrative leave without any legitimate performance issues to justify such actions.

82. As a direct and proximate result of Mr. Moss' actions, Ms. Friary has suffered extreme emotional distress from being robbed of her employment, being publicly humiliated in her professional circle, and facing hardships in her personal relationships because of the abrupt change.

83. As a direct, proximate and legal result of Defendant's acts, Ms. Friary is entitled to recover compensatory damages to compensate for the humiliation, embarrassment, disappointment, and grief caused by Defendant's actions.

84. As a direct, proximate and legal result of Defendant's willful and intentional malicious conduct, as described herein, Ms. Friary has suffered detriment to her person within the meaning of California Civil Code § 3294, thus entitling her to recover punitive damages in an amount to be proven at trial.

**FIFTH CAUSE OF ACTION**

**Unfair Business Practices, Cal. Bus. & Prof. Code §§ 17200, *et seq.***

**(By Plaintiff Against All Defendants)**

85. Ms. Friary incorporates every allegation in the preceding paragraphs, as though set forth fully herein.

86. GlassPoint Solar's policies and/or practices of paying female executive employees less than male executive employees for equal and substantially similar work performed and of retaliating against employees who report perceived illegal practices constitute business practices because both acts and omissions as alleged herein have been done in the course of business and repeatedly over a significant period of time to the detriment of Ms. Friary.

87. GlassPoint Solar's acts and omissions, as alleged herein, violate the California Equal Pay Act, as amended, Labor Code § 1197.5, and California Whistleblower Laws, Labor Code § 1102.5, and therefore constitute unlawful business practices prohibited by Business & Professions



Code § 17200 *et seq.*

88. As a direct and proximate result of GlassPoint Solar's practice of paying women less than men for equal and substantially similar work and retaliating against whistleblowers, causes harm to Plaintiff that outweighs any reason GlassPoint Solar may have for doing so. Plaintiff has suffered extreme emotional distress from being publicly humiliated in her professional circle, facing hardships in her personal relationships because of financial hardship, and facing difficulty starting a new career. GlassPoint Solar's practices as alleged herein is also immoral, unethical, oppressive, unscrupulous, and offensive to the established public policies of ensuring women and men are paid equally for performing equal and substantially similar work, as reflected in both the California Equal Pay Act, Cal. Labor Code §1197.5, and the federal Equal Pay Act, 29 U.S.C. §206(d), and the public policies of ensuring employees can report perceived illegal activities without fear of retaliation in the workplace, as reflected by Cal. Labor Code § 1102.5.

89. As a result of its unlawful and/or unfair business practices, GlassPoint Solar has reaped and continues to reap unfair and illegal profits at the expense of Plaintiff. Accordingly, GlassPoint Solar should be disgorged of its illegal profits, and Plaintiff is entitled to restitution with interest of such ill-gotten profits in an amount according to proof at the time of trial.

90. As a direct, proximate and legal result of Defendant's illegal practices, Ms. Friary is entitled to restitution, preliminary and permanent injunctive relief, and other equitable relief available under the law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1. For all damages legally and/or proximately caused to Plaintiff by Defendants in an amount to be determined at trial;

2. For compensatory, special, and general damages according to proof against all Defendants;

3. For injunctive relief regarding all of Defendants' unlawful business practices;

4. For an award of exemplary punitive damages;

5. For an award of liquidated damages;

6. For an award of all applicable penalties;

7. For costs of suit incurred and all other recoverable costs as authorized by law;

8. For attorneys' fees as authorized by law or agreement; and,

9. For such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands trial by jury on all issues so triable.

Respectfully Submitted,

Date: November 19, 2019

DHILLON LAW GROUP INC.

By: ______________________________

Harmeet K. Dhillon
Dorothy C. Yamamoto
Attorneys for Plaintiff Haley Friary

